**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| INSIGHT DIRECT USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| BRIAN SWAN, SHERIDA TAKACS, and | ) | |
| EXOSOURCE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Insight Direct USA, Inc. ("Insight") for its Complaint against Defendants Brian Swan ("Swan"), Sherida Takacs ("Takacs"), and ExoSource, Inc. ("ExoSource") (collectively, "Defendants"), states as follows:

## INTRODUCTION

1.     In violation of valid and reasonable contracts, two of Insight's most valuable employees, Defendants Swan and Takacs, have joined Defendant ExoSource, a direct competitor of Insight, in similar roles that will inevitably require them to use, divulge and rely on Insight's critical confidential information and trade secrets, and also service and solicit Insight's clients. ExoSource is well aware of Swan and Takacs's contractual confidentiality, non-competition, and customer non-solicitation obligations to Insight, but has nevertheless employed them in roles that are causing them to breach these obligations. ExoSource hired Swan and Takacs in order to obtain the knowledge they gained working at Insight and servicing Insight's clients in the highly specialized maritime industry. ExoSource will unfairly benefit from Swan and Takacs's use of Insight's hard-earned proprietary information and trade secrets without having to do the work or make the investment itself. This is precisely what Swan and Takacs agreed not to do when

-1-

they accepted their contracts with Insight, and it is precisely the sort of conduct that courts do not allow.  By joining ExoSource, Swan and Takacs have not only breached their non-compete obligations to Insight, but they will also use Insight's critical confidential information and trade secrets to directly benefit ExoSource.  And, they have already breached their non-solicitation obligations to Insight by soliciting and working with Insight's clients on behalf of ExoSource.  Defendants' concerted efforts to contravene Swan and Takacs's contractual obligations to Insight will irreparably harm Insight, diminish the value of Insight's confidential information and trade secrets, and unfairly undermine Insight's competitive edge in the marketplace.  Defendants' unlawful activities must be enjoined.

## PARTIES

2.     Insight Direct USA, Inc. is an Illinois corporation with its principal place of business located at 6820 S. Harl Avenue, Tempe, Arizona 85283.

3.     Brian Swan is an individual who resides in Illinois.  Swan lived in Illinois at all times relevant to this Complaint.

4.     Sherida Takacs is an individual who resides in Illinois.  Takacs lived in Illinois at all times relevant to this Complaint.

5.     ExoSource, Inc. is a Florida corporation with its principal place of business located at 1300 Enterprise Drive Suite D, Port Charlotte, Florida 33953.

## JURISDICTION AND VENUE

6.     Jurisdiction is proper in this District pursuant to 28 U.S.C. § 1331 because Insight asserts a cause of action under federal law.  Specifically, Insight asserts a cause of action under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq*.

7.     Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) because Swan

and Takacs reside within the Northern District of Illinois and the unlawful acts giving rise to Insight's claims occurred within this District.

## <u>GENERAL ALLEGATIONS</u>

**Insight's Business**

8.     Insight is a global technology provider specializing in a wide range of information technology hardware, software, and services solutions.

9.     One of Insight's areas of expertise is network infrastructure.  Insight employs experienced technicians, engineers, and architects who develop, install, and manage networks for businesses.

10.     One industry in which Insight has developed network infrastructure expertise is the maritime industry, and specifically, cruise ships.

11.     Insight entered the maritime industry in or around 2011 when Royal Caribbean, now one of its largest clients, sought out Insight's services to develop and configure the network infrastructure for its ships.

12.     For years, Insight has worked closely with Royal Caribbean as its sole provider of network infrastructure services.  As a result, Insight has developed substantial customer goodwill and intimate knowledge of Royal Caribbean's processes, procedures, and preferences.

13.     Insight's knowledge of Royal Caribbean is so deep that Insight's employees are the ones who train and teach new Royal Caribbean employees about Royal Caribbean's network infrastructure.

**Defendant Swan's Role with Insight**

14.     Insight hired Swan as a Senior Network Engineer in 2009, and he became a Network Architect in 2015.

15.     On April 16, 2015, in exchange for valuable consideration, Swan electronically signed a Confidentiality, Intellectual Property, Non-Solicitation, and Non-Competition Agreement (the "Swan Agreement").

16.     Swan and Insight entered into the Swan Agreement to protect Insight's goodwill, trade secrets, confidential and proprietary information, relationships with its prospective and existing clients, and extraordinary and specialized training.

17.     The Swan Agreement, among other restrictions, contains non-compete, non-solicit, and confidentiality restrictions.  A true and correct copy of the Swan Agreement is attached hereto as Exhibit A.

18.     Examples of Insight's Trade Secrets as defined in the Swan Agreement include, but are not limited to:

- Lists of Insight Company or Companies' clients and the key information regarding any such clients such as purchasing needs and habits, and technology products and services clients use or favor, client contract information and negotiated terms;

- Lists of key distributors, suppliers, vendors, and partners of an Insight Company and the key information regarding such business relationships, such as key contact person(s) and contact information, special programs, and negotiated prices, terms and contracts, that is not otherwise disclosed;

- The products and services preferences and the nature and amount of products and services purchased from an Insight Company by each client of an Insight Company;

- All information of any kind related to the client's business obtained by an employee of an Insight Company from a client in the course of any private conversation or communication;

- Software developed by an Insight Company;

- Technical designs, drawings, schematics, and matters created or developed by an Insight Company or contracted vendor or partner.

Exhibit A, ¶ 2.A.

19.     With respect to Insight's trade secret, confidential, and proprietary information, the

confidentiality provision of the Swan Agreement provides:

**2.     Confidentiality**

…

**A.     Protection of Trade Secrets.**

…Both during and after employment with Insight, Employee agrees to protect and preserve the confidentiality of all Trade Secrets of an Insight Company, and agrees that Employee will not, directly or indirectly:

i.      Disclose, publish or make available any Trade Secret of an Insight Company…[or]

ii.     Sell, transfer, or otherwise exploit or permit the sale, transfer, use or exploitation of any Trade Secret of an Insight Company for any purpose other than those for which it was provided.

…

**B.     Protection of Confidential and Proprietary Information.**

…

…Both during and after employment with Insight, Employee agrees to protect and preserve the confidentiality of all Confidential and Proprietary Information of an Insight Company and Third-Party Information, and agrees that Employee will not, directly or indirectly:

i.      Disclose, publish or make available any Confidential and Proprietary Information of an Insight Company and Third-Party Information…[or]

ii.     Sell, transfer, or otherwise exploit or permit the sale, transfer, use or exploitation of any Confidential and Proprietary Information of an Insight Company and Third-Party Information for any purpose other than those for which it was provided.

…

**C.     Provisions Applicable to Both Trade Secrets and Confidential and Proprietary Information.**

Employee recognizes that the Trade Secrets of an Insight Company and various items of Confidential and Proprietary Information of an Insight Company are special and unique assets of the Insight Company or Companies and need to be

protected from improper disclosure and unauthorized use in order to prevent damage to an Insight Company or Companies. The obligation of non-disclosure and non-use of information shall continue to exist so long as such information remains a Trade Secret or Confidential and Proprietary Information, except as otherwise limited above.

Exhibit A, ¶ 2.A-C.

20. Swan also agreed to assign to Insight any and all creations he developed in the course of his employment with Insight:

b. <u>Assignment of Creations</u>. Employee hereby agrees to hold in trust for the sole right and benefit of Insight Companies and assigns to Insight and the Insight Companies all right, title and interest in and to any and all Creations, as defined below, that Employee creates or otherwise develops, alone or in conjunction with others. … "Creation" means any invention, discovery, idea, concept, design, process, work of authorship, client list, development or improvement…, patent, copyright, or trademark: (i) relating to any past, present, or reasonably anticipated business of Insight or its parent, subsidiary, or related companies, and which is or was created or otherwise developed during Employee's employment with an Insight Company, (ii) which is or was created or otherwise developed while performing work for an Insight Company, or (iii) which is or was created or otherwise developed at any time using equipment, supplies, facilities, information or proprietary rights or other property of an Insight Company.

Exhibit A, ¶ 4.b.

21. Swan further agreed to be bound by a non-compete covenant for 6 months following the termination of his employment:

**6.      Non-Competition After Employment.**

…Employee agrees that, for a period of six (6) months following the termination of Employee's employment with Insight…Employee will not, without prior written consent of Insight, engage in Competing Business in the Restricted Territory, where Employee's engagement in such Competing Business would involve or implicate in any manner the use or disclosure (or inevitable use or disclosure) of Trade Secrets or Confidential and Proprietary Information.

Exhibit A, ¶ 6.

22. "Competing Business" is defined as:

[A]ny information technology reseller, provider or seller of information technology services, or any other individual or entity that is directly engaged in or is preparing

to engage in any business which involves the sale, lease, or provision of information technology products or services that are available from Insight or an Insight Company at any time relevant to this Agreement.

Exhibit A, ¶ 5.a.

23.     Swan also agreed to be bound by a customer non-solicitation covenant for twelve

months following the termination of his employment:

### 7.     Non-Solicitation Covenants.

### c.     Employees who are Directors or below the Director level

[F]or a period of twelve (12) months following the termination of Employee's employment with Insight, Employee will not directly or indirectly encourage, induce, solicit or accept business from any client or potential client of an Insight Company, with whom Employee had contact, for whose account Employee worked, or about whom Employee has knowledge of Trade Secrets, Confidential and Proprietary Information or Third-Party Information by reason of Employee's employment with an Insight Company within the last twelve (12) months of employment, with the purpose, effect or potential of: (i) selling (or assisting another person's selling) or providing such client products or services that are the same, similar, or related to products or services provided by an Insight Company; or (ii) in any way reducing the amount of business such client transacts with an Insight Company or the Insight Companies.  Employee acknowledges and agrees that this restriction prohibits Employee from doing business with a covered client for a reasonable period of time even if that client approaches Employee first and attempts to do business with Employee.

Exhibit A, ¶ 7.c.

24.     Swan agreed that in the event he breaches the Swan Agreement, Insight is entitled

to injunctive relief preventing him from rendering any service or making any disclosure that would

breach the Swan Agreement.  Exhibit A, ¶ 8.

25.     The Swan Agreement contains a tolling provision that provides that, in the event

Insight obtains injunctive relief to address a breach, "the duration of the restrictive covenant shall

be computed from the date such relief is granted, reduced by the time period between termination

of Employee's employment, for any reason by either party, and the date of the first breach of the

Agreement by Employee."  Exhibit A, ¶ 8.

26.     As a Senior Network Engineer and Network Architect, Swan worked at Insight's Chicago labs and was responsible for building, testing, troubleshooting, and finalizing deployment of the network infrastructure for Royal Caribbean's new ships as they were being built.

27.     Cruise ship network infrastructure entails everything on a ship that is connected via a network or that uses the internet, such as internal communications on the ship, point of sale systems, CCTV, television in cabins, and guest internet.

28.     Ten years ago, cruise ship networks were small.  There may have been a café where guests could use a desktop computer, but the network was not nearly as extensive as it would be today.

29.     Now, a cruise ship's network is central to its operation, and everything is tied to it. The ship's network infrastructure is what keeps the vessel working when it is out at sea, and it is highly complex and unique due to the cruise ship environment.

30.     In his ten years working at Insight, Swan was integral to developing network infrastructure configurations, processes and procedures specific to Royal Caribbean.  He was part of a long history of trial and error, learning Royal Caribbean's preferences and the reasons behind them, which he could only learn from working at Insight on the Royal Caribbean account for nearly a decade.

31.     Swan learned the details of Royal Caribbean's ship build process, the obstacles that may arise and ways to get around them, which vendors to work with, and when to reach out to them.

32.     The cruise ship build environment is a constrained and highly specialized area.  A network architect who has never worked in the ship build environment would not have this knowledge, as it is not generalized knowledge in the tech industry.

33.     Swan even developed custom tools for Royal Caribbean, which Insight considers to be Trade Secrets and Confidential and Proprietary Information, as well as "Creations" belonging to Insight, as those terms are defined in the Swan Agreement.

34.     Specifically, Swan developed custom software that allows Insight and Royal Caribbean to monitor, inventory, and automatically configure Royal Caribbean's cabin switches.

35.     A cabin switch provides Wi-Fi, television, and phone access to each guest cabin on a cruise ship.  Depending on the size of the ship, there can be hundreds or even thousands of cab switches on a ship.

36.     Swan developed software code that allows Insight to automate configurations and push them out in bulk to all the cabin switches at the same time.  This saves Insight the time, labor, and expense of manually configuring and making adjustments to every individual cabin switch any time a change is necessary.

37.     Swan developed this custom software code specifically for Insight to be used on Royal Caribbean's network infrastructure.  As such, it is not generally known to persons outside of Insight.

38.     Insight took reasonable measures to keep the custom code Swan developed confidential.  Only two people at Insight, Swan and one other individual, had access to the software code Swan developed.  Access to the code is limited by password and credentials.

39.     In addition to learning and developing trade secret, confidential and proprietary and information for Insight, Swan's employment at Insight also led him to develop close customer relationships with Royal Caribbean's employees.

40.     Swan regularly interacted with the Royal Caribbean program manager who lead ship builds, as well as Royal Caribbean's IT employees.

41.     Sometimes, when a ship was brought into a ship yard for revitalization, Swan would travel to the ship yard to work on the network infrastructure maintenance.  During these projects, Swan was with Royal Caribbean's IT staff on a daily basis, working in close quarters, eating together, and staying at the same hotel for weeks at a time.  In this environment, Swan developed close relationships with many of Royal Caribbean's employees.

42.     Swan's expertise and long history with Royal Caribbean made him a trusted resource, to the point where Royal Caribbean would not hesitate to call Swan directly if it had a question or issue relating to its network infrastructure.

**Defendant Takacs's Role with Insight**

43.     Insight hired Takacs in 2015 as a Project Manager, with the intent that she would become its next Program Manager.  She was promoted to Program Manager in 2018.

44.     In connection with her promotion and a corresponding raise in base salary and bonus percentage, Takacs electronically signed a Confidentiality, Intellectual Property, Non-Solicitation, and Non-Competition Agreement (the "Takacs Agreement") on July 29, 2018.

45.     Takacs and Insight entered into the Takacs Agreement to protect Insight's goodwill, trade secrets, confidential information, relationships with its prospective and existing clients, and extraordinary and specialized training.

46.     The Takacs Agreement, among other restrictions, contains non-compete, non-solicit, and confidentiality and restrictions.  A true and correct copy of the Takacs Agreement is attached hereto as Exhibit B.

47.     Examples of Insight's Trade Secrets as defined in the Takacs Agreement include, but are not limited to:

- Lists of Insight Company or Companies' clients and the key information regarding any such clients such as purchasing needs and habits, expiration

dates and terms of software licenses and hardware leases, the technology products and services clients use or favor, client contract information and negotiated terms;

- Lists of key distributors, suppliers, vendors, and partners of an Insight Company and the key information regarding such business relationships, such as key contact person(s) and contact information, special programs, and negotiated prices, terms and contracts, that is not otherwise disclosed;

- The products and services preferences and the nature and amount of products and services purchased from an Insight Company by each client of an Insight Company;

- All information of any kind related to the client's business obtained by an employee of an Insight Company from a client in the course of any private conversation or communication that has not been publicly disclosed by the client;

- Strategic business initiatives, potential significant corporate events, or unique know-how of an Insight Company.

Exhibit B, ¶ 2.A.

48.     The confidentiality provision of the Takacs Agreement provides, in pertinent part:

**2.      Confidentiality.**

       **A.      Protection of Trade Secrets.**

…

Both during and after employment with Insight, Employee covenants and agrees to protect and preserve the confidentiality of all Trade Secrets of an Insight Company, and covenants and agrees that Employee will not, directly or indirectly:

      i.      Disclose, publish or make available any Trade Secret of an Insight Company…[or]

      ii.      Sell, transfer, or otherwise exploit or permit the sale, transfer, use or exploitation of any Trade Secret of an Insight Company for any purpose other than those for which it was provided.

…

       **B.      Protection of Confidential and Proprietary Information.**

…

Both during and after employment with Insight, Employee covenants and agrees to protect and preserve the confidentiality of all Confidential and Proprietary Information of an Insight Company and Third-Party Information, and covenants and agrees that Employee will not, directly or indirectly:

      i.     Disclose, publish or make available any Confidential and Proprietary Information of an Insight Company and Third-Party information…[or]

      ii.     Sell, transfer, or otherwise exploit or permit the sale, transfer, use or exploitation of any Confidential and Proprietary Information of an Insight Company and Third-Party Information for any purpose other than those for which it was provided.

      …

### C.    Provisions Applicable to Both Trade Secrets and Confidential and Proprietary Information.

Employee recognizes and agrees that the Trade Secrets of an Insight Company and various items of Confidential and Proprietary Information of an Insight Company are special and unique assets of the Insight Company or Companies and need to be protected from improper disclosure and unauthorized use in order to prevent damage to an Insight Company or Companies. The obligation of non-disclosure and non-use of information shall continue to exist so long as such information remains a Trade Secret or Confidential and Proprietary Information, except as otherwise limited above.

Exhibit B, ¶ 2.A.-C.

49.     Takacs also agreed to be bound by a non-compete covenant for 6 months following the termination of her employment:

### 6.    Non-Competition After Employment.

…Employee covenants and agrees that, for a period of six (6) months following the termination of Employee's employment with Insight…Employee will not, without prior written consent of Insight, engage in Competing Business in the Restricted Territory.

Exhibit B, ¶ 6.

50.     "Competing Business" is defined as:

[A]ny information technology reseller, provider or seller of information technology services, or any entity that is engaged in or is preparing to engage in any business which involves the sale, lease, or provision of information technology products or services that are available from Insight or an Insight Company and that are

-12-

marketed and sold to companies, businesses, non-profit organizations, governmental entities, and educational institutions or school districts.

Exhibit B, ¶ 5.

51.    Takacs further agreed to be bound by a customer non-solicitation covenant for twelve months following the termination of her employment:

### 7.    Non-Solicitation Covenants.

#### c.    Employees who are Directors or below the Director level

[F]or a period of twelve months following the termination of Employee's employment with Insight, Employee covenants and agrees not to, directly or indirectly, encourage, induce, solicit or accept business from any client or potential client of an Insight Company with whom Employee had contact, for whose account Employee worked, or about whom Employee has knowledge of Trade Secrets, Confidential and Proprietary Information or Third-Party Information by reason of Employee's employment with an Insight Company within the last twelve months of employment, with the purpose, effect or potential of: (i) selling (or assisting another person's selling) or providing such client products or services that are the same, similar, or related to products or services provided by an Insight Company; or (ii) in any way reducing the amount of business such client transacts with an Insight Company. Employee acknowledges and agrees that this restriction prohibits Employee from doing business with a covered client for a reasonable period of time even if that client approaches Employee first and attempts to do business with Employee.

Exhibit B, ¶ 7.c.

52.    Takacs agreed that in the event she breaches the Takacs Agreement, Insight is entitled to injunctive relief preventing her from rendering any service or making any disclosure that would breach the Takacs Agreement. Exhibit B, ¶ 8.

53.    The Takacs Agreement contains a tolling provision that provides that, in the event Insight obtains injunctive relief to address a breach, "the duration of the restrictive covenant shall be tolled and computed from the date such relief is granted, reduced by the time period between termination of Employee's employment, for any reason by either party, and the date of the first breach of the Agreement by Employee." Exhibit B, ¶ 8.

54.     Insight spent years training Takacs, teaching her the intricacies of the maritime business as well as Royal Caribbean's new build and dry dock processes, procedures, and preferences, which can only be learned through experience in the highly specialized area of maritime IT services.

55.     As a Project Manager, Takacs lead IT projects on both new ship builds as well as drydock revitalizations when ships were brought in from sea for maintenance.  She was responsible for scheduling, staffing, working with vendors, keeping track of the project plan and tasks, items, and deadlines required for IT projects.

56.     Drydock projects are demanding, fast paced environments.  When a ship is in drydock, it is taken apart and put back together.  Insight trained Takacs to manage this controlled chaos, and she was successful in her role.

57.     When Takacs was promoted to Program Manager, she oversaw all Royal Caribbean projects and became Royal Caribbean's point of contact at Insight for IT services.

58.     As a Project and Program Manager, Takacs learned the technology products and services Royal Caribbean uses and favors, Royal Caribbean's product and service preferences, and gained knowledge of key vendor information Insight used to service Royal Caribbean.  Each of these constitutes a Trade Secret under the Takacs Agreement, as well as Confidential and Proprietary Information.

59.     Takacs also had access to a Royal Caribbean-specific Wiki developed by her predecessor at Insight.

60.     The Wiki is a living document that Insight's program managers, including Takacs, constantly update with new information about Royal Caribbean.

61.     It is Insight's central repository of information describing all of Royal Caribbean's

processes and procedures necessary for a program manager to know, such as status reports for internal committees, information on supply chain buyers, Royal Caribbean forms, among other things.

62.     The information in Insight's Royal Caribbean Wiki was gathered and developed over the course of years and contains information and knowledge specific to Royal Caribbean, which Takacs could only have learned by working at Insight for the Royal Caribbean account.

63.     The information on the Royal Caribbean Wiki to which Takacs had access could be used by an Insight competitor to provide competing services to Royal Caribbean, without having had to invest the time, money, resources, and personnel Insight invested in working with Royal Caribbean for nearly a decade.

64.     Insight took reasonable measures to maintain the secrecy of the Royal Caribbean Wiki. The Wiki is maintained on Insight's non-public SharePoint, and is accessible only to Insight employees who are staffed on the Royal Caribbean account. It is not known by the public or anyone other than the Insight employees who work on the Royal Caribbean account.

**Defendants Swan's and Takacs's Employment at Defendant ExoSource**

65.     In or around January 2019, Swan and Takacs left Insight and began working for ExoSource.

66.     Like Insight, ExoSource is an IT solutions company and provides network infrastructure and security services for businesses.

67.     ExoSource traditionally focused its business on IT security services. However, ExoSource has recently been expanding into providing the same IT infrastructure services Insight provides, making ExoSource a direct competitor of Insight.

68.     ExoSource previously did not perform network infrastructure services for Insight's

clients Royal Caribbean and Ritz Carlton.

69.     Upon information and belief, ExoSource hired Swan and Takacs for positions substantially similar to the ones in which they worked at Insight.

70.     ExoSource had knowledge of the Swan Agreement and Takacs Agreement when it hired Swan and Takacs, and therefore had knowledge of their confidentiality, non-competition, and non-solicitation obligations.

71.     A letter from Swan's attorney, Michael Martin, confirmed that Swan shared a copy of the Swan Agreement with ExoSource.

72.     Nevertheless, ExoSource is employing Swan and Takacs in roles that violate their non-competition obligations and that will lead them to disclose Insight's trade secrets and confidential and proprietary information.

73.     Upon information and belief, ExoSource hired Swan and Takacs away from Insight as a shortcut into the maritime network infrastructure space so that ExoSource can avoid expending the time, resources, and personnel necessary to become competitive in this space.

74.     Upon information and belief, ExoSource hired Swan and Takacs to benefit from the trade secret, confidential, and proprietary knowledge and information they gained while working at Insight.

75.     Upon information and belief, ExoSource also hired Swan and Takacs to benefit from the close customer relationships they developed with Royal Caribbean and other Insight clients so that ExoSource can steal those clients' business away from Insight.

76.     In fact, Swan and Takacs are already working with Insight's clients in their roles at ExoSource, in violation of their non-solicitation obligations.

77.     Insight has been copied on emails from Royal Caribbean and Ritz Carlton where

Swan and Takacs were also listed on the emails, demonstrating that they are working with Insight's clients while employed at ExoSource.

78.     Upon information and belief, Swan has also been in contact with Royal Caribbean in an attempt to bring its business to ExoSource.

79.     If Swan and Takacs continue to work for ExoSource in their current capacities and continue to solicit and work with Insight's clients at ExoSource, Insight will lose business.  Indeed, it already has.  After ExoSource hired Swan and Takacs, Royal Caribbean selected ExoSource to provide network infrastructure services on a drydock project.

80.     Insight's trade secret, confidential and proprietary information is at risk of disclosure because Swan and Takacs will use that information in the course of servicing Insight's clients on behalf of ExoSource.

**COUNT I**
**Breach of Contract – Non-Competition**
**(Injunctive Relief and Damages)**
**Against Swan**

81.     Insight realleges and incorporates by reference Paragraphs 1 through 80 as though fully set forth herein.

82.     The Swan Agreement is a valid and enforceable contract.

83.     Among other obligations under the Swan Agreement, Swan agreed and was obligated, during the period of his employ and for a period of six (6) months following the termination of the Swan Agreement, not to engage in Competing Business that would involve or implicate the use or disclosure or inevitable use or disclosure of Insight's trade secrets or confidential and proprietary information.

84.     The terms of the Swan Agreement are not greater than is required for the protection of Insight's legitimate business interests, including its trade secret, confidential and proprietary

information and the valuable relationships it has with its clients, which were developed at considerable expense, time and difficulty.

85. Swan breached the Swan Agreement by accepting employment with ExoSource in a role that inevitably will require him to use Insight's trade secret, confidential and/or proprietary information.

86. Insight has fully performed its contractual obligations to Swan under the Swan Agreement.

87. Insight has suffered and will continue to suffer damages as a result of Swan's breach of contract, including diminished value of its trade secret, confidential and proprietary information, and loss of its valuable relationships with its clients, which were developed at considerable expense, time and difficulty.

88. Insight's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

89. Swan's actions will continue to cause harm to Insight if not restrained.

90. Insight has demonstrated that Swan, unless restrained, will engage in conduct that breaches the Swan Agreement.

91. The terms of the Swan Agreement do not pose an undue hardship on Swan.

92. The Swan Agreement is not injurious to the public.

93. Should this Court grant injunctive relief to Insight, the burden on Swan would be slight compared to the injury to Insight if it is not granted. No injury to Swan would result from an order requiring him to comport his actions under the Swan Agreement. Swan furthermore agreed injunctive relief would be an appropriate remedy in the event he breached the Swan Agreement.

94. The grant of an injunction will not disserve the public interest. Indeed, injunctive relief is consistent with the Swan Agreement between the parties.

**WHEREFORE**, Insight prays for judgment against Swan and requests the Court grant the following relief:

A. Entry of a Permanent Injunction against Swan, enjoining Swan from breaching the Swan Agreement;

B. Entry of a declaratory judgment in favor of Insight, and against Swan, finding that the conduct complained of is illegal and unfair and violates the Swan Agreement between the parties;

C. Entry of an order tolling the restrictions in the Swan Agreement as set forth in the Swan Agreement;

D. For actual, compensatory and exemplary damages to be determined at trial; and

E. Such other and further relief the Court deems as just.

**<u>COUNT II</u>**
**Breach of Contract – Non-Solicitation**
**(Injunctive Relief and Damages)**
**Against Swan**

95. Insight realleges and incorporates by reference Paragraphs 1 through 80 as though fully set forth herein.

96. The Swan Agreement is a valid and enforceable contract.

97. Among other obligations under the Swan Agreement, Swan agreed and is obligated, for a period of twelve (12) months following the termination of his employment with Insight, not to encourage, induce, solicit, or accept business from any client or potential client of Insight with whom he had contact, for whose account he worked, or about whom he had knowledge of trade secrets, confidential and proprietary information or third-party information.

98.     The terms of the Swan Agreement are not greater than is required for the protection of Insight's legitimate business interests, including its trade secret, confidential and proprietary information and the valuable relationships it has with its clients, which were developed at considerable expense, time and difficulty.

99.     Swan breached the Swan Agreement by accepting employment with ExoSource in a role that requires him to accept business from and work with Insight's clients with whom he worked at Insight, including Royal Caribbean and Ritz Carlton.

100.    Swan further breached the Swan Agreement by, upon information and belief, contacting Royal Caribbean for purposes of bringing its business to ExoSource.

101.    Insight has fully performed its contractual obligations to Swan under the Swan Agreement.

102.    Insight has suffered and will continue to suffer damages as a result of Swan's breach of contract, including diminished value of its trade secret, confidential and proprietary information, and loss of its valuable relationships with its clients, which were developed at considerable expense, time and difficulty.

103.    Insight's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

104.    Swan's actions will continue to cause harm to Insight if not restrained.

105.    Insight has demonstrated that Swan, unless restrained, will engage in conduct that breaches the Swan Agreement.

106.    The terms of the Swan Agreement do not pose an undue hardship on Swan.

107.    The Swan Agreement is not injurious to the public.

108.    Should this Court grant injunctive relief to Insight, the burden on Swan would be

slight compared to the injury to Insight if it is not granted. No injury to Swan would result from an order requiring him to comport his actions under the Swan Agreement. Swan furthermore agreed injunctive relief would be an appropriate remedy in the event he breached the Swan Agreement.

109.     The grant of an injunction will not disserve the public interest. Indeed, injunctive relief is consistent with the Swan Agreement between the parties.

**WHEREFORE**, Insight prays for judgment against Swan and requests the Court grant the following relief:

A.  Entry of a Permanent Injunction against Swan, enjoining Swan from breaching the Swan Agreement;

B.  Entry of a declaratory judgment in favor of Insight, and against Swan, finding that the conduct complained of is illegal and unfair and violates the Swan Agreement between the parties;

C.  Entry of an order tolling the restrictions in the Swan Agreement as set forth in the Swan Agreement;

D.  For actual, compensatory and exemplary damages to be determined at trial; and

E.  Such other and further relief the Court deems as just.

**COUNT III**
**Breach of Contract – Confidentiality**
**(Injunctive Relief and Damages)**
**Against Swan**

110.     Insight realleges and incorporates by reference Paragraphs 1 through 80 as though fully set forth herein.

111.     The Swan Agreement is a valid and enforceable contract.

112.     Among other obligations under the Swan Agreement, Swan agreed and is obligated

to protect and preserve the confidentiality of all Trade Secrets and Confidential and Proprietary Information of Insight and Third-Party Information, as those terms are defined in the Swan Agreement.

113.    The terms of the Swan Agreement are not greater than is required for the protection of Insight's legitimate business interests, including its trade secret, confidential and proprietary information and the valuable relationships it has with its clients, which were developed at considerable expense, time and difficulty.

114.    Swan breached the Swan Agreement by accepting employment with ExoSource in a role that is the same or substantially similar to his role at Insight and that requires him to rely upon, disclose, and use Insight's trade secret, confidential and proprietary information.

115.    Given the similarity of roles and the nature of the position, Swan cannot perform his job at ExoSource without using, referencing or relying upon Insight's trade secrets, confidential and proprietary information.

116.    Insight has fully performed its contractual obligations to Swan under the Swan Agreement.

117.    Insight has suffered and will continue to suffer damages as a result of Swan's breach of contract, including diminished value of its trade secret, confidential and proprietary information, and loss of its valuable relationships with its clients, which were developed at considerable expense, time and difficulty.

118.    Insight's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

119.    Swan's actions will continue to cause harm to Insight if not restrained.

120.    Insight has demonstrated that Swan, unless restrained, will engage in conduct that

breaches the Swan Agreement.

121.    The terms of the Swan Agreement do not pose an undue hardship on Swan.

122.    The Swan Agreement is not injurious to the public.

123.    Should this Court grant injunctive relief to Insight, the burden on Swan would be slight compared to the injury to Insight if it is not granted.  No injury to Swan would result from an order requiring him to comport his actions under the Swan Agreement.  Swan furthermore agreed injunctive relief would be an appropriate remedy in the event he breached the Swan Agreement.

124.    The grant of an injunction will not disserve the public interest.  Indeed, injunctive relief is consistent with the Swan Agreement between the parties.

**WHEREFORE**, Insight prays for judgment against Swan and requests the Court grant the following relief:

A.  Entry of a Permanent Injunction against Swan, enjoining Swan from breaching the Swan Agreement;

B.  Entry of a declaratory judgment in favor of Insight, and against Swan, finding that the conduct complained of is illegal and unfair and violates the Swan Agreement between the parties;

C.  For actual, compensatory and exemplary damages to be determined at trial; and

D.  Such other and further relief the Court deems as just.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## COUNT IV
### Breach of Contract – Non-Competition
### (Injunctive Relief and Damages)
### Against Takacs

125.     Insight realleges and incorporates by reference Paragraphs 1 through 80 as though fully set forth herein.

126.     The Takacs Agreement is a valid and enforceable contract.

127.     Among other obligations under the Takacs Agreement, Takacs agreed and was obligated, during the period of her employ and for a period of six (6) months following the termination of the Takacs Agreement, not to engage in Competing Business.

128.     The terms of the Takacs Agreement are not greater than is required for the protection of Insight's legitimate business interests, including its trade secret, confidential and proprietary information and the valuable relationships it has with its clients, which were developed at considerable expense, time and difficulty.

129.     Takacs breached the Takacs Agreement by accepting employment with ExoSource in a role that inevitably will require her to use Insight's trade secret, confidential and/or proprietary information.

130.     Given the similarity of roles and the nature of the position, Takacs cannot perform her job at ExoSource without using, referencing or relying upon Insight's trade secrets, confidential and proprietary information.

131.     Insight has fully performed its contractual obligations to Takacs under the Takacs Agreement.

132.     Insight has suffered and will continue to suffer damages as a result of Takacs's breach of contract, including diminished value of its trade secret, confidential and proprietary

information, and loss of its valuable relationships with its clients, which were developed at considerable expense, time and difficulty.

133.    Insight's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

134.    Takacs's actions will continue to cause harm to Insight if not restrained.

135.    Insight has demonstrated that Takacs, unless restrained, will engage in conduct that breaches the Takacs Agreement.

136.    The terms of the Takacs Agreement do not pose an undue hardship on Takacs.

137.    The Takacs Agreement is not injurious to the public.

138.    Should this Court grant injunctive relief to Insight, the burden on Takacs would be slight compared to the injury to Insight if it is not granted. No injury to Takacs would result from an order requiring her to comport her actions under the Takacs Agreement. Takacs furthermore agreed injunctive relief would be an appropriate remedy in the event she breached the Takacs Agreement.

139.    The grant of an injunction will not disserve the public interest. Indeed, injunctive relief is consistent with the Takacs Agreement between the parties.

**WHEREFORE**, Insight prays for judgment against Takacs and requests the Court grant the following relief:

A.  Entry of a Permanent Injunction against Takacs, enjoining Takacs from breaching the Takacs Agreement;

B.  Entry of a declaratory judgment in favor of Insight, and against Takacs, finding that the conduct complained of is illegal and unfair and violates the Takacs Agreement between the parties;

C. Entry of an order tolling the restrictions in the Takacs Agreement as set forth in the Takacs Agreement;

D. For actual, compensatory and exemplary damages to be determined at trial; and

E. Such other and further relief the Court deems as just.

**COUNT V**
**Breach of Contract – Non-Solicitation**
**(Injunctive Relief and Damages)**
**Against Takacs**

140. Insight realleges and incorporates by reference Paragraphs 1 through 80 as though fully set forth herein.

141. The Takacs Agreement is a valid and enforceable contract.

142. Among other obligations under the Takacs Agreement, Takacs agreed and is obligated, for a period of twelve (12) months following the termination of her employment with Insight, not to encourage, induce, solicit, or accept business from any client or potential client of Insight with whom she had contact, for whose account she worked, or about whom she had knowledge of trade secrets, confidential and proprietary information or third-party information.

143. The terms of the Takacs Agreement are not greater than is required for the protection of Insight's legitimate business interests, including its trade secret, confidential and proprietary information and the valuable relationships it has with its clients, which were developed at considerable expense, time and difficulty.

144. Takacs breached the Takacs Agreement by accepting employment with ExoSource in a role that requires her to accept business from and work with Insight's clients with whom she worked at Insight, including Royal Caribbean and Ritz Carlton.

145. Takacs has been in contact and is working with Insight's clients at ExoSource, including Ritz Carlton.

146.     Insight has fully performed its contractual obligations to Takacs under the Takacs Agreement.

147.     Insight has suffered and will continue to suffer damages as a result of Takacs's breach of contract, including diminished value of its trade secret, confidential and proprietary information, and loss of its valuable relationships with its clients, which were developed at considerable expense, time and difficulty.

148.     Insight's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

149.     Takacs's actions will continue to cause harm to Insight if not restrained.

150.     Insight has demonstrated that Takacs, unless restrained, will engage in conduct that breaches the Takacs Agreement.

151.     The terms of the Takacs Agreement do not pose an undue hardship on Takacs.

152.     The Takacs Agreement is not injurious to the public.

153.     Should this Court grant injunctive relief to Insight, the burden on Takacs would be slight compared to the injury to Insight if it is not granted.  No injury to Takacs would result from an order requiring her to comport her actions under the Takacs Agreement.  Takacs furthermore agreed injunctive relief would be an appropriate remedy in the event she breached the Takacs Agreement.

154.     The grant of an injunction will not disserve the public interest.  Indeed, injunctive relief is consistent with the Takacs Agreement between the parties.

**WHEREFORE**, Insight prays for judgment against Takacs and requests the Court grant the following relief:

A.  Entry of a Permanent Injunction against Takacs, enjoining Takacs from breaching the

Takacs Agreement;

B. Entry of a declaratory judgment in favor of Insight, and against Takacs, finding that the conduct complained of is illegal and unfair and violates the Takacs Agreement between the parties;

C. Entry of an order tolling the restrictions in the Takacs Agreement as set forth in the Takacs Agreement;

D. For actual, compensatory and exemplary damages to be determined at trial; and

E. Such other and further relief the Court deems as just.

**COUNT VI**
**Breach of Contract – Confidentiality**
**(Injunctive Relief and Damages)**
**Against Takacs**

155.    Insight realleges and incorporates by reference Paragraphs 1 through 80 as though fully set forth herein.

156.    The Takacs Agreement is a valid and enforceable contract.

157.    Among other obligations under the Takacs Agreement, Takacs agreed and is obligated to protect and preserve the confidentiality of all Trade Secrets and Confidential and Proprietary Information of Insight and Third-Party Information, as those terms are defined in the Takacs Agreement.

158.    The terms of the Takacs Agreement are not greater than is required for the protection of Insight's legitimate business interests, including its trade secret, confidential and proprietary information and the valuable relationships it has with its clients, which were developed at considerable expense, time and difficulty.

159.    Takacs breached the Takacs Agreement by accepting employment with ExoSource in a role that is the same or substantially similar to her role at Insight and that requires her to rely

upon, disclose, and use Insight's trade secret, confidential and proprietary information.

160. Insight has fully performed its contractual obligations to Takacs under the Takacs Agreement.

161. Insight has suffered and will continue to suffer damages as a result of Takacs's breach of contract, including diminished value of its trade secret, confidential and proprietary information, and loss of its valuable relationships with its clients, which were developed at considerable expense, time and difficulty.

162. Insight's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

163. Takacs's actions will continue to cause harm to Insight if not restrained.

164. Insight has demonstrated that Takacs, unless restrained, will engage in conduct that breaches the Takacs Agreement.

165. The terms of the Takacs Agreement do not pose an undue hardship on Takacs.

166. The Takacs Agreement is not injurious to the public.

167. Should this Court grant injunctive relief to Insight, the burden on Takacs would be slight compared to the injury to Insight if it is not granted. No injury to Takacs would result from an order requiring her to comport her actions under the Takacs Agreement. Takacs furthermore agreed injunctive relief would be an appropriate remedy in the event she breached the Takacs Agreement.

168. The grant of an injunction will not disserve the public interest. Indeed, injunctive relief is consistent with the Takacs Agreement between the parties.

**WHEREFORE**, Insight prays for judgment against Takacs and requests the Court grant the following relief:

A. Entry of a Permanent Injunction against Takacs, enjoining Takacs from breaching the Takacs Agreement;

B. Entry of a declaratory judgment in favor of Insight, and against Takacs, finding that the conduct complained of is illegal and unfair and violates the Takacs Agreement between the parties;

C. For actual, compensatory and exemplary damages to be determined at trial; and

D. Such other and further relief the Court deems as just.

**COUNT VII**
**Misappropriation of Trade Secrets under Illinois Trade Secrets Act**
**(Injunctive Relief and Damages)**
**Against ExoSource, Swan and Takacs**

169.     Insight realleges and incorporates by reference Paragraphs 1 through 80 as though fully set forth herein.

170.     The Illinois Trade Secrets Act, 765 ILCS 1065/2 et seq. ("ITSA"), forbids the actual and threatened misappropriation of trade secrets. Under the ITSA, "trade secret" means "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d).

171.     Under the ITSA, "misappropriation" means "(1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of a person without express or implied consent by another person who: (A) used improper means to acquire knowledge of the trade secret;

or (B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was: (I) derived from or through a person who utilized improper means to acquire it; (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." 765 ILCS 1065/2(b).

172.    Under the ITSA, "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means." 765 ILCS 1065/2(a).

173.    Certain confidential and proprietary information of Insight constitutes trade secrets under the ITSA, including, but not limited to, lists of Insight Company or Companies' clients and the key information regarding any such clients such as purchasing needs and habits, and technology products and services clients use or favor, client contract information and negotiated terms; lists of key distributors, suppliers, vendors, and partners of an Insight Company and the key information regarding such business relationships, such as key contact person(s) and contact information, special programs, and negotiated prices, terms and contracts, that is not otherwise disclosed; the products and services preferences and the nature and amount of products and services purchased from an Insight Company by each client of an Insight Company; all information of any kind related to the client's business obtained by an employee of an Insight Company from a client in the course of any private conversation or communication; software developed by an Insight Company; technical designs, drawings, schematics, and matters created or developed by

an Insight Company or contracted vendor or partner; and strategic business initiatives, potential significant corporate events, or unique know-how of an Insight Company.

174.    Insight derives economic benefit from the fact that its trade secrets are not generally known to individuals or entities outside of Insight.

175.    Insight takes reasonable measures to protect its trade secrets.  These measures include protecting the customized code Swan created with a password and credentials, and limiting access to the code to only Swan and one other individual.  Additionally, Insight limits access to the Royal Caribbean Wiki to only those Insight employees who work on the Royal Caribbean account.

176.    Swan knew he had a duty to maintain the secrecy and confidentiality of Insight's trade secrets due, in part, to the Swan Agreement and his status as a Network Architect.

177.    Takacs knew she had a duty to maintain the secrecy and confidentiality of Insight's trade secrets due, in part, to the Takacs Agreement and her status as a Program Manager.

178.    ExoSource is under a duty not to accept any misappropriated trade secrets, including Insight's trade secrets, and ExoSource is also under a duty not to disclose or utilize misappropriated trade secrets for the purpose of gaining a competitive advantage in the marketplace.

179.    Defendants have used improper means to acquire, disclose and utilize Insight's trade secrets without consent of any kind for their own financial gain.

180.    Swan will inevitably continue to disclose and utilize Insight's trade secrets in the course of his employment with ExoSource.

181.    Takacs will inevitably continue to disclose and utilize Insight's trade secrets in the course of her employment with ExoSource.

182.     ExoSource has accepted and utilized Insight's trade secrets for the purpose of improving its business operations and diverting business and clients away from Insight. ExoSource continues to do so and poses a continuing threat to further misappropriate such trade secrets.

183.     Defendants' actions constitute actual and threatened misappropriation in violation of the ITSA, and also constitute willful misappropriation.

184.     Insight has suffered damages and irreparable harm as a result of Defendants' violation of the ITSA, including diminution in the value of its trade secrets and an unfair reduction in its competitive advantage.

185.     Insight is entitled to actual damages and punitive damages from Defendants, jointly and severally, and for attorneys' fees.

186.     Insight's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to any compensatory relief.

187.     Defendants' actions will continue to cause irreparable harm and damages to Insight and its trade secret information if not restrained.

**WHEREFORE**, Insight prays for judgment against ExoSource, Swan and Takacs and requests the Court grant the following relief:

A.  Entry of a Permanent Injunction against ExoSource, Swan and Takacs, enjoining ExoSource, Swan and Takacs from misappropriating and threatening to misappropriate Insight's trade secrets;

B.  For actual, compensatory and exemplary damages to be determined at trial; and

C.  Such other and further relief the Court deems as just.

**COUNT VIII**
**Violation of the Defend Trade Secrets Act**
**(Injunctive Relief and Damages)**
**Against ExoSource, Swan and Takacs**

188.     Insight realleges and incorporates by reference Paragraphs 1 through 80 as though fully set forth herein.

189.     The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the U.S. Code, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

190.     Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

191.     Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret

was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5).

192.    Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

193.    Certain confidential and proprietary information of Insight constitutes trade secrets under the DTSA, including, but not limited to, lists of Insight Company or Companies' clients and the key information regarding any such clients such as purchasing needs and habits, and technology products and services clients use or favor, client contract information and negotiated terms; lists of key distributors, suppliers, vendors, and partners of an Insight Company and the key information regarding such business relationships, such as key contact person(s) and contact information, special programs, and negotiated prices, terms and contracts, that is not otherwise disclosed; the products and services preferences and the nature and amount of products and services purchased from an Insight Company by each client of an Insight Company; all information of any kind related to the client's business obtained by an employee of an Insight Company from a client in the course of any private conversation or communication; software developed by an Insight Company; technical designs, drawings, schematics, and matters created or developed by

an Insight Company or contracted vendor or partner; and strategic business initiatives, potential significant corporate events, or unique know-how of an Insight Company.

194.     Insight derives economic benefit from the fact that its trade secrets are not generally known to individuals or entities outside of Insight.

195.     Insight takes reasonable measures to protect its trade secrets.  These measures include protecting the customized code Swan created with a password and credentials, and limiting access to the code to only Swan and one other individual.  Additionally, Insight limits access to the Royal Caribbean Wiki to only those Insight employees who work on the Royal Caribbean account.

196.     Swan knew he had a duty to maintain the secrecy and confidentiality of Insight's trade secrets due, in part, to the Swan Agreement and his status as a Network Architect.

197.     Takacs knew she had a duty to maintain the secrecy and confidentiality of Insight's trade secrets due, in part, to the Takacs Agreement and her status as a Program Manager.

198.     ExoSource is under a duty not to accept any misappropriated trade secrets, including Insight's trade secrets, and ExoSource is also under a duty not to disclose or utilize misappropriated trade secrets for the purpose of gaining a competitive advantage in the marketplace.

199.     Defendants have used improper means to acquire, disclose and utilize Insight's trade secrets without consent of any kind for their own financial gain.

200.     Swan threatens to continue to disclose and utilize Insight's trade secrets in the course of his employment with ExoSource.

201.     Takacs threatens to continue to disclose and utilize Insight's trade secrets in the course of her employment with ExoSource.

202.   ExoSource has accepted and utilized Insight's trade secrets for the purpose of improving its business operations and diverting business and clients away from Insight. ExoSource continues to do so and poses a continuing threat to further misappropriate such trade secrets.

203.   Defendants' actions constitute actual and threatened misappropriation in violation of the DTSA.

204.   Insight has suffered damages and irreparable harm as a result of Defendants' violation of the DTSA, including diminution in the value of its trade secrets and an unfair reduction in its competitive advantage.

205.   Insight is entitled to actual damages and punitive damages from Defendants, jointly and severally, and for attorneys' fees.

206.   Insight's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to any compensatory relief.

207.   Defendants' actions will continue to cause irreparable harm and damages to Insight and its trade secret information if not restrained.

**WHEREFORE**, Insight prays for judgment against ExoSource, Swan and Takacs and requests the Court grant the following relief:

A.  Entry of a Permanent Injunction against ExoSource, Swan and Takacs, enjoining ExoSource, Swan and Takacs from misappropriating and threatening to misappropriate Insight's trade secrets;

B.  For actual, compensatory and exemplary damages to be determined at trial; and

C.  Such other and further relief the Court deems as just.

## COUNT IX
**Tortious Interference with Prospective Economic Advantage**
**(Injunctive Relief and Damages)**
**Against ExoSource, Swan and Takacs**

208.    Insight realleges and incorporates by reference Paragraphs 1 through 80 as though fully set forth herein.

209.    Insight has a reasonable expectation of continuing its valid relationships with its clients, including Royal Caribbean and Ritz Carlton.

210.    ExoSource, Swan, and Takacs had knowledge of Insight's expectation.

211.    ExoSource willfully recruited and hired Insight's former employees Swan and Takacs, knowing Swan and Takacs have non-solicitation obligations to Insight, in order to benefit from their relationships with Insight's clients, including Royal Caribbean and Ritz Carlton.

212.    ExoSource, Swan and Takacs are willfully providing services to Insight's clients, including Royal Caribbean and Ritz Carlton, in violation of Swan's and Takacs's non-solicitation obligations to Insight.

213.    ExoSource, Swan and Takacs's provision of services to Insight's clients, including Royal Caribbean and Ritz Carlton, is preventing Insight's legitimate expectation that its relationship with Royal Caribbean and Ritz Carlton will continue.

214.    ExoSource, Swan and Takacs's actions are improper, unjustified, malicious and in reckless disregard for Insight's rights.

215.    ExoSource, Swan and Takacs's actions caused Insight damages, in losing client business in which Insight has invested considerable time and expense developing.

216.    Insight has suffered and will continue to suffer damages and irreparable harm as a direct result of ExoSource, Swan and Takacs's tortious interference with its valid client relationships, including diminished value of its trade secret, confidential and proprietary

information, loss of its valuable relationships with clients, which were developed at considerable expense, time and difficulty, and an unfair reduction in its competitive advantage.

217.     Insight's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

218.     ExoSource, Swan and Takacs's actions will continue to cause irreparable harm and damages to Insight if not restrained.

219.     Insight has demonstrated that ExoSource, Swan and Takacs, unless restrained, will engage in conduct that tortiously interferes Insight's valid client relationships.

220.     Should this Court grant injunctive relief to Insight, the burden on ExoSource, Swan and Takacs would be slight compared to the injury to Insight if it is not granted.  No injury to ExoSource, Swan, and Takacs would result from an order requiring them to refrain from interfering with Insight's legitimate client relationships with clients who are unlawfully solicited.

221.     The grant of an injunction will not disserve the public interest.

**WHEREFORE**, Insight prays for judgment against ExoSource, Swan and Takacs and requests the Court grant the following relief:

A.  Entry of a Permanent Injunction against ExoSource, Swan and Takacs, enjoining ExoSource, Swan and Takacs from interfering with Insight's client relationships;

B.  For actual, compensatory and exemplary damages to be determined at trial; and

C.  Such other and further relief the Court deems as just.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**COUNT X**
**Unjust Enrichment**
**(Damages)**
**Against ExoSource**

222.　Insight realleges and incorporates by reference Paragraphs 1 through 80 as though fully set forth herein.

223.　ExoSource has benefitted from hiring Insight's employees Swan and Takacs, in violation of their non-competition obligations to Insight, as ExoSource avoided the time and expense of developing the processes, procedures, knowledge, and client relationships undertaken by Insight.

224.　ExoSource's retention of this benefit is unjust, as it hired Swan and Takacs with knowledge that doing so violated their non-competition obligations to Insight.

225.　ExoSource has benefitted to Insight's detriment.　Insight has lost experienced employees in whom it had invested considerable time, expense, and resources in training, and who have knowledge of Insight's trade secret, confidential and proprietary information as well as relationships with Insight's customers, which they are using for ExoSource's benefit and to Insight's detriment.

226.　ExoSource's retention of this benefit violates the fundamental principles of justice, equity, and good conscience, because it benefited from the unlawful acts of Swan and Takacs, namely their violation of their non-competition and non-solicitation obligations to Insight.

**WHEREFORE**, Insight prays for judgment against ExoSource and requests the Court grant the following relief:

A.　For actual, compensatory and exemplary damages to be determined at trial; and

B.　Such other and further relief the Court deems as just.

**JURY DEMAND**

Insight hereby asserts its right to a trial by jury.

Dated:  May 10, 2019                        Respectfully submitted,

INSIGHT DIRECT USA, INC.

By:  /s/ *Kevin M. Cloutier*  _____
                        One of Its Attorneys

Kevin M. Cloutier, Esq.
Shawn D. Fabian, Esq.
Amy I. Harwath, Esq.
SHEPPARD MULLIN RICHTER & HAMPTON LLP
70 West Madison Street, 48th Floor
Chicago, Illinois 60602
Tel: (312) 499-6300
Fax: (313) 499-6301
kcloutier@sheppardmullin.com
sfabian@sheppardmullin.com
aharwath@sheppardmullin.com